and we move to case number five Huff v. Buttigieg. Mr. Adams? Mr. Adams, we can't hear you. Can you hear me now? Yes. Sorry, my microphone apparently wasn't working. May it please the court, my name is Sam Adams. I represent the appellant Alice Robbins Huff in Appeal. Ms. Huff was not terminated for getting a DUI. She was not terminated for failing a drug test or an alcohol test. She was not terminated for missing recovery meetings as part of her treatment and rehabilitation plan. She was terminated for sending emails requesting confirmation that certain medications had been approved. The district court's grand summary judgment should be reversed because for three reasons. First, the court did not properly consider Ava Wright and her conduct as the proximate cause of Huff's termination. Second, the court did not consider the evidence showing that Wright's actions were motivated by retaliatory animus and that for proffered reasons for issuing the non-compliance were protectable. And third, the court erred in finding that Ms. Huff's refusal to accept the second treatment rehabilitation plan were an intervening cause of her termination. So Mr. Adams, I wonder, for my benefit at least, if you could focus on the second of those three points that you just outlined because it seems possible to me. I mean, where I've been having trouble connecting the dots for your client's case is the notion that this decision was actually retaliatory. You know, she might have been, Wright may have been a work to rule kind of person. She may have had reasons for thinking that a telephone conversation was preferable to email exchanges. Maybe this was arbitrary, but there's a difference, is there not, between something that's arbitrary and something that's retaliatory? Yes, thank you, your honor. Well, there are a number of reasons. First, and this is something that is completely ignored by the defendant in their briefing and the district court in its opinion, but Ms. Huff testified that she did actually make phone calls and speak with the flight surgeon to obtain the approval prior to taking any medications and gaining that approval. But that doesn't really make it into the record. I mean, I know you say that. Is it your position that the record here would permit the inference that every single time she made a phone call in addition to the emails? We have the initial July 2016 communication where Dr. Holmes just says all of these medications are approved medications, period. I mean, so surely there would be some kind of record of phone calls. Well, we have her testimony and that's what is in the record. And the only contrary testimony is the testimony of Ava Wright and the flight surgeon. So we have the fact that she did make the phone calls and that the emails were to try to create a record so that she could demonstrate if there were allegations made against her in the future that she could contradict that. There is also the fact that the plain reading of the treatment and rehabilitation plan did not prohibit sending these emails. The plain language simply said that she could not take unauthorized medication. Now there I agree with you. I mean, looking at that paragraph, I'm not going to give it an A in English draftsmanship. She agrees to receive approval. That sentence doesn't say anything about via text, via email, via courier pigeon, via a phone call, except during an emergency. Okay, fine. And then there's this sort of hang on sentence at the end. I also agree to telephone the medical review officer, et cetera, at a certain number, which you could read as saying this is the number I'm going to get. It's not that my only method of communication will be by phone. So I think you have, but the problem that I have with that part of the argument is even if it started out ambiguous, by the time we get to some of the later communications, such as even the August 2016 set of communications, not to mention December of that year and later, it seems that the agency is making its position clear that it wants telephone. I saw this as sort of a preference for telemedicine. You can't just sort of throw a drug name. The doctor may want to ask about other conditions. The doctor might want to make sure that's an appropriate drug for the situation, which I realize is not an argument they made. They made a kind of not persuasive confidentiality argument instead, but I can imagine why you might want telephone calls. Well, another, Your Honor, another fact that shows that this was pretextual and not honest is the August 10th email, the proverbial straw that broke the camel's back, was an email that did not request medication authorization. It identified that she was having upcoming surgery. It said that she would be unavailable for, it requested absences from smart recovery meetings, treatment at Fairbanks and things like that, and notified the drug testers that she would not be available for drug testing if they were to show up, but it did not mention any medication by name. How could she get authorization for a medication if she didn't even disclose the name of the drug? Evidence in the record also shows that she did obtain separate authorization from Dr. Reeds, and he testified in his deposition that she used an appropriate channel there. So the fact that her alleged final infraction wasn't even what she was alleged to have done fits within the framework of Coleman versus Donahoe, Statler versus Walmart, Williams versus Bristol-Myers Squibb, and Gordon versus United Airlines, which we have cited, which say that applying a rule or policy that does not objectively reasonably apply and using that as a basis for termination is circumstantial evidence of pretext, and evidence of pretext, again, could be evidence of a retaliatory motive. There's also the fact that Ms. Wright has demonstrated, in multiple occasions, dishonesty. She falsely put in her EEO affidavit that she had no role in the termination decision. That is directly contradicted by Charles Smith's testimony that said that she was intimately involved in the discussion surrounding whether to terminate Ms. Huff or not, and that she was the only one who was adamant that this violation must result in termination. Do we have any evidence in this record that would shed light on why? I mean, Ms. Wright also might have just thought that having a 0.14 blood alcohol content is a really, really serious problem, and that nothing short of to-the-letter compliance with the recovery plan would do, the employee assistance plan. Well, Your Honor, we have the troubling email that Ms. Wright sent to her husband, wherein she attached her EEO affidavit. She admitted that that was a confidential document that she was not supposed to share with her husband, was not involved with the process, and her reason that she said in her deposition for sending that was she wanted to explain to I think the jury could very well infer from that that she was angry about this and saying, you know, look at what she's saying about me, look at what she's doing, you know, and that would be indicia of her retaliatory animus. If there are no further questions, Your Honors, I think I am running out of time. Thank you, Counsel. Mr. Kirkland? Mr. Kirkland, we can't hear you. I'm sorry, Your Honor. Is that better? Yes. All right. My apologies, Your Honor. May it please the Court. My name is Taylor Kirkland. I represent the Appalachee Youth Department of Transportation through its Secretary in this the District Court correctly granted summary judgment to the defendant on Ms. Huff's allegations of retaliatory discharge. Looking at that same evidence in the record, this Court should affirm. I want to start by addressing a point that Mr. Adams made in his argument. This is the first time that Ms. Huff's testimony has been supported by contemporaneous phone calls that would have complied with the TRP policies. I want to direct the Court to several points in the record that demonstrate that that deposition testimony from Ms. Huff is not supported by her own evidence in her email. So document number 4423, Ms. Huff's email from June 29th, 2017, is a request to the Flight Surgeons do not respond to her email on July 11th, 2017. Two weeks later, Ms. Huff sends a follow-up email to the Flight Surgeon demanding to know why they've not responded to her first email. If Ms. Huff, as she said at deposition, was contemporaneously just documenting her phone calls with the Flight Surgeons, there would have been no reason for her to send the subsequent follow-up email. We see exactly the same fact pattern occur at docket number 4424. This is the August 10, 2017 email where Ms. Huff alerts the Flight Surgeons to this upcoming surgery. And then at docket number 4422, she follows up on August 25th, 2017 and demands to know why the Flight Surgeons haven't responded and then gives them the information she obtained from the Aviation Medical Examiner. How, Mr. Kirkland, does the follow-up preclude a call? Well, Your Honor, the summary judgment standard only allows Ms. Huff the benefit of reasonable inferences. There's no reasonable inference that if Ms. Huff, as she said at her deposition on June 29th, 2017, actually had a conversation with the Flight Surgeons, it would be completely unreasonable for two weeks later for her to send a separate email to the Flight Surgeons and not know why they haven't responded to her first email. But why wouldn't it be perfectly reasonable if that phone call had just been an inconclusive discussion, you know, where the Flight Surgeon didn't give either a clear yes or a clear no? Well, that's not what Ms. Huff testified in her deposition. She said that these were documented, that she was just documenting these contemporaneous phone calls. So looking at her own words in these emails, there's not a reasonable inference that that's actually what was happening. And that brings me to the second point on that, which is that these emails were not allowed under the TRP. And that's, as Judge Wood explained a few minutes ago, that was clearly laid out to Ms. Huff no later than August 2016. So this is an entire year before she was terminated. Dr. Holmes explicitly told her in no uncertain terms to call and not to send emails, and she said that that was the only thing that was allowable under the TRP. And that gets me to a criticism that is in the reply brief that I don't think is fair. The appellant says that the government wants this court to ignore the language of the plan and to ignore the language of the evidence in the record, and nothing could be further from the truth. If this court looks at the language of the plan and the reasons why Ms. Huff went on the plan in the first place, it's very clear that the government's position was justified and reasonable. First of all, Ms. Huff occupied a safety-sensitive position in the federal aviation airspace. The government rightly was very concerned that somebody occupying this safety-sensitive position may do or take certain substances that may undermine their judgment, that may impair their ability to operate these computer systems safely and effectively. That was absolutely laid out, and Ms. Huff 100% agrees with this. There's no dispute that the terms and conditions applicable to her employment in this safety-sensitive position demanded that she exercise good judgment and demonstrate credibility to her employer. So there was this underlying notion for the government that she needed to demonstrate good judgment and credibility, and when we get to the language of the plain terms of the Treatment and Rehabilitation Plan, the government's position is further confirmed. In the Treatment and Rehabilitation Plan, Ms. Huff admitted that her drunk driving arrest constituted a violation of the terms and conditions for employment. There is no dispute about that. If she had not entered into the Treatment and Rehabilitation Plan, she could have just been immediately terminated. The plan was explicit. You know, the thing that's so strange about this case, or you know, why it's a difficult case, because there's a lot of evidence of, you know, inappropriate action on the part of Ms. Wright, of a wild overreaction to a very technical violation, the proverbial swatting a fly with a sledgehammer. She isn't fighting the fact that she needs to be on this recovery kind of plan. She finds the smart recovery people, the government narrowly escaping, I would say, a free exercise clause challenge on that point. For Ms. Wright to assume what she knows Christians do or don't believe about the AA Big Book is a little wild, but anyway, that gets fixed after a fairly short period of time. And, you know, there are quite a few people at the agency who don't think that firing her, let's not use the word terminate, that sounds dramatic, but that firing her isn't the right approach. And it's quite ambiguous as to this last chance agreement from management, whether, you know, she actually realized the sequencing that she needed to go, because she thinks that she's been complying. We have evidence from her that she makes phone calls, that she is trying to make sure in advance of, say, the carpal tunnel surgery, and all of a sudden she finds herself without a job, you know, and so you need to come up with some reason for that. Yeah, and I think there are many reasons in the record, Your Honor. First of all, there's testimony, and we've cited this in our brief, from the flight surgeons about why this telephone requirement was so important, and it's twofold. First of all, the flight surgeons are making complicated medical judgments about the inner reaction of medications on a person's recovery. That's hard enough, but couple that with the responsibility of ensuring that the planes that this person is responsible for when they're operating these computer systems don't crash. This is an extraordinarily important thing. The flight surgeons, in light of those two dual considerations, wanted to make sure that they could actually have a interaction with Ms. Hough about these medications, and Your Honor, I think, hit the point right on the nail right on the head a few minutes ago when you said that not only had Dr. Holmes made the interpretation of the TRP completely clear to Ms. Hough in August of 2016, but this was subsequently reiterated to Ms. Hough over the ensuing year. I mean, this was a refrain that the FAA was telling her over and over, if you want to abide by this TRP, you need to call and not email. The mystifying thing about this appeal, and I agree with Your Honor that it is in some ways mystifying, is why Ms. Hough didn't simply comply with that when, under the terms of the TRP that she signed, in order to save her job, she agreed to, quote, strict adherence with all the elements of the TRP, and she acknowledged that failure to comply with any condition in it would result in disciplinary action. Having entered into that in order to save her job, it's baffling why Ms. Hough didn't simply accede to the clear directives that the flight surgeon was giving to her in order to comply with this TRP. I just want to make one other point. Mr. Adams noted this in his argument. He says that the August 10, 2017 email was not actually a request for medication, and the basis of that argument is that because Ms. Hough didn't actually specify the medication she was going to be taking, that it couldn't have been a request for authorization of medication. I don't think that can possibly be squared with what Ms. Hough actually says. She says, quote, I will be taking this medication for a surgery I will be having, and she asked to know how long it will stay in her system. The fact that Ms. Hough did not identify the medication in that email only creates a further deficiency on her part. Well, what she says, if we're going to be picky about it, she says, please advise in writing how long these types of pain medications will stay in my system, and then she explains why she's asking the question, as I do not want this temporary situation to be a reason for me to fail any of the drug tests. Now that is just like, do I need to plan on two weeks out? Do I need to plan on three weeks out? Do I need to plan on five days out? She doesn't say, can I take Vicodin? Can I take Oxycodone? Can I take, you know, Benadryl? Can I take aspirin? You know, she's just asking generically for planning purposes, how long do I need to budget? Your Honor, I see my time has expired. May I respond to that point? You may, yes. Thank you, Your Honor. I would just point the court to the notice of, I'm sorry, the notice of proposed removal. This is docket 44-5 at page 2. In that, it documents that actually the medication that Ms. Huff subsequently asked for approval for was, quote, hydrocodone acetaminophen, so that would be a pain killer. And I agree with Your Honor, with Judge Wood, that she doesn't actually spell that out in the particular email that's at docket number 44-2, but I think that a fair reading of those emails does indicate that she was asking for medication approval. With that, we respectfully ask this court to affirm. Thank you. Mr. Adams, do you need additional time? I'll give you another minute. Okay, thank you, Your Honor. First thing I would say is her testimony about, Ms. Huff's testimony about the calls that she made and what she testified about the follow-up emails were not just to follow up that she had made the request. She testified, I believe, that she had sent the emails so that she could also confirm the approval in writing so that there wouldn't be any issues if anything came up on a drug test or any further allegations. And I would go to Mr. Kirkland's last point where he talked about the August 10th email, and he talked about that there was a subsequent discussion in which the medications were discussed, the actual medications. The evidence in the record shows that she made those in a Dr. Reese, who testified that she did that in an approved manner. So, the August 10th email, again, as Judge Wood pointed out, was discussing the amount of time that they would be in her system to alert the drug testers. I see that. And with that, Your Honors, if there are no further questions, I would ask that the court reverse the district court's branding summary. Thanks to both counsel in case we've taken under advisement.